Todd Wengrovsky
Law Offices of Todd Wengrovsky, PLLC.
285 Southfield Road, Box 585
Calverton, NY 11933
Tel (631) 727-3400

*Attorney for Plaintiffs*

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE**
------------------------------------------------------------------X
INNOVATIVE PATENTS, LLC. AND
FORCEFIELD, LLC.,

                                Plaintiffs,

                                                    Index No. 07-CV-680 (MPT)

                -against-

BRAIN PAD, INC.

                                Defendant.
------------------------------------------------------------------X

**PLAINTIFFS' MEMORANDUM OF LAW
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT
OF PATENT INFRINGEMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES……………………………………………....……......ii

I. PRELIMINARY STATEMENT……………………...…..…………...……….…..……1

II. STATEMENT OF FACTS………………………..…...………………….……1

    A. "PLAINTIFFS' PATENT"……...…………………………………….....1

    B. "DEFENDANTS' PRODUCTS"……...………………….…..…………….....2

    C. "THE PRIOR ART"……...…………………........................……………...3

III. LEGAL STANDARDS ………………………….....................................................5

    A. "LEGAL STANDARDS CONCERNING SUMMARY JUDGMENT"…..……….5

    B. "LEGAL STANDARDS GOVERNING PATENT INFRINGEMENT"…..…….....5

IV. ARGUMENT: BRAIN PAD'S PRODUCT INFRINGES
AT LEAST ONE CLAIM OF THE '174 PATENT……………………………..................7

    A. "CLAIM 1"……...……………………...…………………………....7

        1. "Sweatband"…………………………………………………….…7

        2. "At Least One Insert Permanently Placed Within The Sweatband"………......8

        3. "Relatively Thin In Nature"……………………………………….…9

        4. "Curved In Configuration"…………………………………….……....10

        5. "The Insert Of Sufficient Length To Protect An Intended Area
And Of Sufficient Width"……………………………………………...15

        6. "The Sweatband Reversible, Functioning To Allow The Interior Portion
To Dry While The Exterior Portion Is Placed Against The User"……………..15

        7. "The Apparatus Functioning To Absorb Perspiration And Absorb And
Dissipate Impact Forces, With Only Remaining Forces Distributed
To The User"…………………………………………………………..16

    B. "CLAIM 2"……………………….…....…...………………………….....16

    C. "CLAIM 3"……...…………………….…....…...…………………….....17

D. "CLAIM 4"……...…………………………...………...…………….…………...……………...18

E. "CLAIM 5"……...…………………………...………...………...…………….…………...18

F. "CLAIM 6"……...…………………………...………...…………...………...………...19

G. "CLAIM 7"……...…………………………...…………………………………………...…..19

H. "CLAIM 9"……...…………………………...……………….……………….…..20

V. CONCLUSION…………………………………………………………….…….……...…20

**<u>TABLE OF AUTHORITIES</u>**

<u>Cases:</u>

*Al-Site Corp. v. VSI Int'l, Inc*.,
174 F.3d 1308, 1320 (Fed. Cir. 1999)……………………………………..……..11

*Anderson v. Liberty Lobby, Inc*.,
477 U.S. 242, 247-248 (1986)……………………………………………..…...5

*Asyst Tech, Inc. v. Empak, Inc*.,
268 F.3d 1364, 1369-70 (Fed. Cir. 2001)…………………………………………..11

*Avia Group Int'l, Inc. v. L. A. Gear Co., Inc*.,
853 F.2d 1557, 1561 (Fed. Cir. 1988)……………………………………………..5

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc*.,
296 F.3d 1106, 1113-14 (Fed. Cir. 2002)…………………………………..……11

*First National Bank of Arizona v. Cities Services Co*.,
391 U.S. 253 (1968)………………………………………………………….………6

*Gart v. Logitech*,
254 F.3d 1334, 1339 (Fed. Cir. 2001)……………………………………………….6

*Graver Tank & Mfg. Co, v. Linde Air Prods.*,
339 U.S. 605, 609 (1950)…………………………………………………….……..12

*Ishida Co. v. Taylor*,
221 F.3d 1310, 1316-17 (Fed. Cir. 2000)…………………………………………..11

*Johnson & Johnston Assoc. v. R.E. Service.*,
285 F.3d 1046 (Fed. Cir. 2002) (en banc)…………………………….…………..12

*Karlin Technology, Inc. v. Surgical Dynamics, Inc*.,
177 F.3d 968, 970 (Fed. Cir. 1999)……………………………………..………6

*Markman v. Westview*,
52 F.3d 967, 976 (Fed. Cir. 1995)………………………………………..………6

*Odetics, Inc. v. Storage Tech. Corp*.,
185 F.3d 1259, 1266-68 (Fed. Cir. 1999)…………………………………..……11

*Seal-Flex, Inc. v. Athletic Track & Court Const*.,
172 F.3d 836, 843-44 (Fed. Cir. 1999)………………………………….………11

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co*.,
520 U.S. 17 (1997)…………………………………………………………...………..12

*Warner-Lambert Co. v. Teva Pharms USA, Inc*.,
418 F.3d 1326, 1341 (Fed. Cir. 2005)…………………………………………………..6

*W. L. Gore v. Garlock, Inc.*,
842 F.2d 1275, 1281 (Fed. Cir. 1988)…………………………………………………..7

**<u>Statutes and Other Authorities:</u>**

35 U.S.C. 112…………………………………………………...………………….....11

## I. PRELIMINARY STATEMENT

Plaintiffs Forcefield, LLC. and Innovative Patents, LLC. ("Forcefield") move for summary judgment of infringement of U.S. Patent Number 7,234,174 herein.  In light of this Court's Order dated January 13, 2010 regarding *Markman* claim construction, the patent-in-suit is valid over the prior art, and Defendant Brain Pad, Inc. has infringed Claims 1-7 and 9 thereof.

## II.  STATEMENT OF FACTS

### A.  PLAINTIFF' PATENT:

U.S. Patent 7,234,174 entitled "Apparatus For Enhancing Absorption And Dissipation Of Impact Forces For Sweatbands" (the "'174 patent") was filed on November 17, 2005 and granted to inventor Dr. Carl J. Abraham on June 26, 2007.  A copy of the '174 patent is attached hereto as **EXHIBIT A.**   The patent was subsequently assigned to Plaintiff Innovative Patents, LLC.

The patent relates to a sweatband for protection in sporting activities. The sweatband comprises at least one insert to protect the user from impact forces. As such, the invention provides a lightweight, comfortable means to protect the athlete, while still absorbing perspiration in the manner of a typical sweatband.

Previously in the industry, protecting one's head meant wearing bulky headgear, i.e. helmets. However, helmet-type protection covered most of the user's entire head and often required chin straps to be secured.  This made them uncomfortable and unfashionable to wear.  Helmet-type protection retained excessive heat, obstructed vision, and prevented soccer players from properly "heading the ball" and are therefore not permitted under most leagues' rules and regulations.

Due to such deficiencies, protective headgear was not being worn <u>at all</u> in sports such as soccer, even though players' heads commonly collide with other heads, knees, elbows, and goal posts, especially when the players are children. Plaintiff also identified that some players

declined to wear the headgear of the prior art because the bulky products would "single them out" on the field, an important consideration among children and teens concerned with their appearance. Therefore, Plaintiff developed a means to significantly reduce the severity of injuries to athletes <u>without</u> using heavy, bulky headgear. The '174 patent's teaching of a *protective* headband that absorbs impact forces <u>yet looks and acts like a regular sweatband</u> was a novel and important advancement in the art – one that the industry failed to implement for decades.[1]

## B.  DEFENDANT'S PRODUCTS:

Defendant Brain Pad commercialized a headband that comprises at least one insert to protect the user by absorbing and dissipating impact forces. Brain Pad's headband is also perspiration-absorbing and reversible, like a regular headband, as taught by the '174 Patent

Attached hereto as **EXHIBIT B** is the initial Expert Report of Dr. Fred R. Stolfi, a Professor and Senior Lecturer of Mechanical Engineering at Columbia University.  **EXHIBIT B** will be referred to several times herein because it contains concise exhibits regarding the accused product.  To illustrate Brain Pad's product, Pages 61 through 66 of **EXHIBIT B** show color photographs of Defendant's product, with annotations indicating that every element of Claim 1 is found on the accused product. Pages 67 through 76 of **EXHIBIT B** show Defendant's advertising and promotional materials, which describe the features of Defendant's product. Pages 49 through 53 of **EXHIBIT B** consist of an infringement claim chart, which also indicates that every element of Claim 1 is found on Defendant's product.

Importantly, Defendant was well aware of Plaintiffs' product when Defendant "launched" a product with the *same* features in April, 2006 – over one year *after* Plaintiffs' product was

---

**1.**  It should also be noted that the Abraham protective sweatband is reversible like a regular headband.

commercially available. (See **EXHIBIT C –** Brain Pad principal Joseph Manzo Depo. P. 140, L. 19 – P. 142, L. 14).  The relevant timeline of events is as follows:

- August 22, 2002        Filing date of Abraham '395 Patent;

- June 10, 2003          Filing date of Abraham '487 Patent;

- January 13, 2004       Issue date of Abraham '395 Patent;

- January, 2005          Forcefield's display of its product at a national industry trade show;

- November 17, 2005   Filing date of Abraham '174 Patent;

- December 27, 2005   Issue date of Abraham '487 Patent;

- April, 2006            Brain Pad's "launch" of the accused product;

- May 22, 2006          Brain Pad's filing of Patent Application Serial No. 11/419560;

- June 26, 2007          Issue date of Abraham '174 Patent.

The foregoing illustrates that Brain Pad copied the Forcefield design.  Though the usage of sweatbands and head protection devices had been <u>separately</u> well known in the industry for many years, <u>no one</u> combined such features until Forcefield introduced their product.

## C. THE PRIOR ART:

The closest prior art to the '174 patent consists of the aforementioned products that cover the entire top of the user's head, resulting in hot, bulky headgear. For example, Patents 5,930,841 and 6,266,827 to Lampe look like helmets, covering the top of the head and utilizing chin straps:



Patent 6,247,181 to Hirsch also shows full top-of-the-head coverage, and, like the above inventions, fails to provide the perspiration absorption of a sweatband:



The limited prior art that can be considered analogous to *sweatbands* consists of large items (especially when measured from the user's eyebrow toward the user's hairline) which simply do not look like typical headbands. As an example, although the below-depicted invention of Patent 5,598,585 to Stroup does not cover the top of the head, it is clearly a bulky device that does not resemble a typical headband (or stay in place like a typical headband):



Although Brain Pad has cited additional references throughout this litigation, such are merely cumulative to the references that <u>were</u> considered (and discarded) by the patent examiner.

To summarize, the prior art teaches *<u>away</u>* from the Abraham invention because they cover the entire top of the head, do not absorb perspiration, or do not resemble regular headbands. Such are the reasons why no single prior art reference anticipates the Abraham invention. Such are also the reasons why the Abraham invention would only have been obvious if one were to use impermissible hindsight and a piecemeal approach of borrowing separate features from separate references to result in the unique combination of the '174 patent. The distinctions

between the '174 patent and the prior art are clear, which is why inventor Abraham had no trouble getting three (3) utility patents issued for his concept.  In fact, *Defendant* <u>*Brain Pad* has characterized the prior art in the same way as inventor Abraham</u>.  Specifically, on May 22, 2006, Brain Pad principal Joseph Manzo filed a patent application for the accused Brain Pad product. Though subsequently *published*, the Manzo application was repeatedly rejected and never issued. The Manzo application is attached hereto as **EXHIBIT D,** and states the following:

> "[0004] Other athletic gear are primarily protective in nature and are designed to absorb impacts. **These devices are typically much more bulky** and complex in construction than conventional sweatbands **and are not adapted to provide effective perspiration absorption**" (emphasis added).

The Manzo application continued:

> "[0006] An advantage exists, therefore, a thin athletic band which is economical to manufacture yet provides considerable impact protection coupled with effective perspiration removal."

Therefore, *even Brain Pad* admitted that the Abraham invention was a novel advancement over the prior art.  If a sweatband the style of the '174 patent and Brain Pad were obvious, Defendant Brain Pad would not have applied for a patent for same.

## III.  LEGAL STANDARDS

## A. LEGAL STANDARDS GOVERNING SUMMARY JUDGMENT

Summary judgment is a <u>favored procedural device</u> "and it is <u>as appropriate in a patent case as it is in any other case</u>."  *Avia Group Int'l, Inc. v. L. A. Gear Co., Inc*., 853 F.2d 1557, 1561 (Fed. Cir. 1988).  Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c) See also *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242,

247-248 (1986); *Karlin Technology, Inc. v. Surgical Dynamics, Inc*., 177 F.3d 968, 970 (Fed. Cir. 1999). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id*. **Here, there are no genuine material issues of fact that would preclude judgment for Forcefield. Such is particularly the case given the simplicity of the product at issue.**

Regarding Defendant's burden, a party *opposing* a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but… must set forth specific facts showing that there is a <u>genuine issue for trial</u>." *Id*. (quoting *First National Bank of Arizona v. Cities Services Co*., 391 U.S. 253 (1968). "If the evidence [opposing summary judgment] is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. At 249-250 (citations omitted).

## B. LEGAL STANDARD GOVERNING PATENT INFRINGEMENT

Determination of patent infringement is a two-step analysis. *Markman v. Westview,* 52 F.3d 967, 976 (Fed. Cir. 1995); *Gart v. Logitech*, 254 F.3d 1334, 1339 (Fed. Cir. 2001). The first step is to construe the claims of the patent. *Id*. The second is to compare the accused device to the construed claims. *Id*. The accused device literally infringes a claim if every limitation of the claim is found in the accused device. *Karlin*, 177 F.3d at 974.

Here, Forcefield is entitled to summary judgment because it establishes herein that it is "more likely than not" that Brain Pad's product possesses the asserted claim elements. *Anderson*, 477 U.S. at 252; *Warner-Lambert Co. v. Teva Pharms USA, Inc*., 418 F.3d 1326, 1341 (Fed. Cir. 2005). Once patent infringement has been established, a permanent injunction should issue against Brain Pad's distribution of the product unless special circumstances exist for

refusing one.  *W. L. Gore v. Garlock, Inc.*, 842 F.2d 1275 (Fed. Cir. 1988).  As outlined below, Brain Pad has infringed *at least* one claim of the '174 Patent and Forcefield there are no "special circumstances" that would preclude a permanent injunction in Forcefield's favor.

## IV.  ARGUMENT: BRAIN PAD'S PRODUCT INFRINGES AT LEAST ONE CLAIM OF THE '174 PATENT

### A. CLAIM 1:

Brain Pad's product comprises each element of Claim 1 literally, or, in the alternative, under the doctrine of equivalents.  Claim 1 appears as follows, with bold portions indicating key terms construed by the Court in the *Markman* proceeding:

"1. An apparatus for enhancing absorption and dissipation of forces for sweatbands comprising:

a soft, pliable **sweatband** of a generally annular configuration, the sweatband further comprising an exterior portion and interior portion, the sweatband designed to be placed around the head of a user, from the forehead to back of the head,

at least one insert permanently placed within the sweatband, the insert **relatively thin in nature** and positioned to protect at least the forehead area of a user,

the insert **curved in configuration**, the insert of sufficient length to protect **an intended area** and of sufficient width,

the sweatband reversible, functioning to allow the interior portion to dry while the exterior portion is placed against the user,

the apparatus functioning to absorb perspiration and absorb and dissipate impact forces, with only remaining forces distributed to the user."

### 1. "Sweatband"

The first element of Claim 1 is "a soft, pliable sweatband of a generally annular configuration."  The Court's *Markman* ruling regarding "sweatband" is *"a band of absorbent material worn around the forehead to absorb perspiration."*

The accused Brain Pad product has a soft, yielding, flexible band of fabric or material that absorbs perspiration.  This is proven by **EXHIBIT B** - Appendix E, Figures 12, 13, 14 and 18b.

Claim 1 then describes the sweatband as "further comprising <u>an exterior portion and interior portion</u>,"  Clearly, the Brain Pad sweatband has an exterior section and interior section. (See **EXHIBIT B** - Appendix E, Figure 14, Elements A and B).

Finally, Claim 1 describes the sweatband as being "designed to be placed <u>around the head of a user, from the forehead to back of the head</u>,"  Brain Pad's sweatband is indeed designed to be worn on the user's head (rather than on another extremity). Brain Pad's sweatband circumferentially encircles the user's head from the forehead to the back of the head. This is proven by **EXHIBIT B** - Appendix E, Figure 11 and Figure 12; Appendix F, Figure 19 and Figure 23.  In addition, Plaintiff's expert testified that he placed the Brain Pad product on his head to verify that it fit in the above-described manner. (**EXHIBIT B**, P. 37, L.1).

As illustrated by the foregoing, there can be no question that Brain Pad's product literally satisfies every limitation of Claim 1 relative to the term "sweatband."

**2. "At Least One Insert Permanently Placed Within The Sweatband"**

The next element in Claim 1 is that "at least one insert" is "permanently placed within the sweatband."  The Brain Pad product indeed contains "at least one" insert placed within the sweatband.  This is proven by **EXHIBIT B** - Appendix E, Figure 12 and Figure 16, Element A. More particularly, Brain Pad offers sweatbands that have an insert that absorbs impact forces. This is proven by the <u>product packaging</u> (see **EXHIBIT B** - Appendix E, Figure 11 and Figure 12), further proven by the advertising on <u>Brain Pad's website</u> (see **EXHIBIT B** - Appendix F, Figure 20) and further proven by the advertising on a <u>distributor website</u> (see **EXHIBIT B** - Appendix F, Figures 25, 26, and 27). Brain Pad refers to these products as "Product ID:

Protective Headbands" available in a variety of colors (HPB-01 black, HPB-02 navy, HPB-03 white, and HPB-04 red) and "Product ID: Protective Wristbands" available in a variety of colors (WPB-05 black, WPB-06 navy, WPB-07 white, and WPB-08 red) (**EXHIBIT B** - Appendix F, Figure 23, Order Form: Appendix F, Figure 24, and the product announcement: Appendix F, Figure 28). In addition, Plaintiff's expert testified that he purchased several products from Brain Pad to verify the above. (**EXHIBIT B**, P. 36, L.12).   Therefore, Brain Pad's product literally meets the limitation regarding at least one insert permanently placed in the sweatband.

### 3. "Relatively Thin In Nature"

Next, the Court's *Markman* Ruling regarding "relatively thin in nature" is *"the thickness of the insert, varying according to need, i.e., to better protect the user."*

Brain Pad's sweatband comprises an insert with a relatively thin cross section for the purpose of protecting a user from injury. This is proven by **EXHIBIT B** - Appendix E, Figure 11, Figure 12, Figure 16, Element A, Figure 17 c, and Figure 18 b.

Clearly, Brain Pad's insert is thin enough to serve the inventor's purpose - to provide a lightweight, non-burdensome means to protect the athlete. (See **EXHIBIT E** - Stolfi Expert Rebuttal Report, P. 15, L. 7-9, where Dr. Fred R. Stolfi confirmed that "The insert should be thin enough to accomplish the purpose of the invention"; see also **EXHIBIT F** - Abraham Expert Report, P. 7, L. 20 to P. 8, L. 2, and **EXHIBIT G** - Abraham Expert Rebuttal Report, Page 5, L. 13-24).   Again, the '174 patent specification constantly emphasizes that the invention has the appearance and comfort of an ordinary headband.  A host of statements in the '174 specification repeat the constant theme that the invention is less bulky than the prior art (most of which covered the entirety of the top of the head). Moreover, the '174 patent distinguishes the Abraham

invention from lightweight <u>helmets</u> and products with forehead protective <u>plates</u>: [See '174 Patent, Col. 2, L. 63 to Col. 3, L. 3; Col. 5, L. 26-29; Col. 6, L. 11-13; Abstract, L. 10-13.

Directly in accordance with the Court's *Markman* ruling, Brain Pad's insert is designed to "better protect the user." Per the multiple photographs of Brain Pad's product throughout **EXHIBIT B**, the accused product is also lightweight and non-burdensome.

In the *Markman* proceeding, Defendant's proposed construction of "relatively thin" required that the insert be thin relative to its width and length. Though such construction was not even adopted by the Court, Plaintiff's expert confirmed that "If the court *were to* accept Mr. Gililland's construction of this claim, the BrainPad product <u>still</u> literally infringes the '174 Patent since the BrainPad product is thin relative to either of its other two dimensions." As such, there can be no dispute that Brain Pad's insert meets the "relatively thin" claim limitation.

### 4. "Curved In Configuration"

The Court's *Markman* Ruling regarding the insert being "curved in configuration" is *"preformed, arcuate and having first and second ends."* Brain Pad's insert <u>has curvature and is therefore "arcuate</u>." The Brain Pad insert is also compliant and curves to conform to the particular shape of the user's head. (See **EXHIBIT B** - Appendix E, Figure 17 and Figure 18).

Importantly, Dr. Stolfi testified (regarding Defendant's expert's proposed and generally adopted claim term construction) that: "If the court were to accept Mr. Gililland's construction of this claim, the BrainPad product ***still* literally infringes** the '174 Patent since <u>the BrainPad product **is** curved and the insert retains its curve when removed from the sweatband</u>" (emphasis added). (**EXHIBIT E**, P. 16, L.15). Dr. Stolfi also testified that: "when the BrainPad product is in use on the head of a user in an athletic activity, it looks exactly like the embodiment depicted

in Figure 1 from the '174 Patent. The fact that the insert in the BrainPad product is *thinner* that the insert depicted in the figure is immaterial to the language of the claim."

Furthermore, the *Markman* construction requires that the insert have first and second ends. Brain Pad's insert **has** first and second ends which are then joined together to form a loop.

**Here, it is critical to note that the Court's *Markman* construction for the "*intended area*" of the '174 insert is "*at least <u>one insert</u> can be positioned in a variety of places within the sweatband, including covering the <u>entire horizontal circumference of the head</u>.*" Because the Court confirmed that Claim 1 provides for at least <u>one insert</u>, and because the Court confirmed that such can cover the <u>full horizontal circumference of the head</u>, the Court therefore confirmed that <u>the '174 Patent covers one insert that forms a complete loop</u>.**

Due to the all of foregoing, it is Plaintiff's firm position that Brain Pad's insert literally satisfies this claim element.

However, even if the Brain Pad insert did not *literally* infringe, it still absolutely infringes under the <u>doctrine of equivalents</u>. Whether an accused feature is *equivalent* is decided from the perspective of a person of ordinary skill in the art. If such a person would consider any difference(s) between the structure found in the accused product and the structure described in the patent to be **insubstantial**, the structures are equivalent. 35 U.S.C. § 112; *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc*., 296 F.3d 1106, 1113-14 (Fed. Cir. 2002); *Asyst Tech, Inc. v. Empak, Inc*., 268 F.3d 1364, 1369-70 (Fed. Cir. 2001); *Ishida Co. v. Taylor*, 221 F.3d 1310, 1316-17 (Fed. Cir. 2000); *Odetics, Inc. v. Storage Tech. Corp*., 185 F.3d 1259, 1266-68 (Fed. Cir. 1999); *Al-Site Corp. v. VSI Int'l, Inc*., 174 F.3d 1308, 1320 (Fed. Cir. 1999); *Seal-Flex, Inc. v. Athletic Track & Court Const*., 172 F.3d 836, 843-44 (Fed. Cir. 1999).

One way to determine whether any difference(s) are *insubstantial* is to consider whether the accused part performs <u>substantially the same function</u>, in <u>substantially the same way</u>, to achieve <u>substantially the same result</u>, i.e. persons of ordinary skill in the art would have known of the <u>interchangeability</u> of the part with the claimed requirement.  However, it should be noted that the known interchangeability between the claim element and the accused part is not even required to find infringement under the doctrine of equivalents. *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co*., 520 U.S. 17 (1997); *Graver Tank & Mfg. Co, v. Linde Air Prods.*, 339 U.S. 605, 609 (1950); *Johnson & Johnston Assoc. v. R.E. Service.*, 285 F.3d 1046 (Fed. Cir. 2002) (en banc).

**Here (provided the insert is not stiff), whether the insert has "pre-curvature" or is alternatively *given* curvature from the curved, annular sweatband results in the same thing – a curved insert.  The performance of the insert would be identical either way, and the user would never even know whether the insert had "pre-curvature" or not.**

Indeed, Brain Pad can not possibly argue that their insert does not have the same function as the '174 insert, or that it does not accomplish the same result as the '174 insert, or that it does not accomplish the result in the same way as the '174 insert.  Why else would Brain Pad add cost and weight to the sweatband by utilizing such an insert?  As such (if Brain Pad's insert is not *literally* infringing) – it is *at least* a classic equivalent.

Importantly, the doctrine of equivalents was upheld by the Supreme Court in *Festo Corporation v. Shoketsu Kinzoku Kogyo Kabushiki Co., LTD*, 535 U.S. 722 (2002), wherein the Supreme Court vacated a Federal Circuit holding that created an absolute bar to the doctrine when claims were altered during the amendment process.  In so doing, the high court stated:

"The language in the patent claims may not capture every nuance of the invention or describe with complete precision the range of its novelty. If patents were always interpreted by their literal terms, their value would be greatly diminished. Unimportant and insubstantial substitutes for certain elements could defeat the patent, and its value to inventors could be

destroyed by simple acts of copying. For this reason, the clearest rule of patent interpretation, literalism, may conserve judicial resources but is not necessarily the most efficient rule. The scope of a patent is not limited to its literal terms but instead embraces all equivalents to the claims described. See *Winans v Denmead*, 15 How. 330, 347 (1854)."

The Supreme Court's *Festo* holding created a ***rebuttable*** presumption of prosecution history estoppel when claims are amended during prosecution for patentability reasons.  However, the *Festo* Court recognized several situations where an amendment may **not** reasonably be viewed as surrendering a particular equivalent. The Court identified three (3) exceptions in which a presumption barring equivalents would be overcome: (1) the equivalent in question was unforeseeable at the time of the application; (2) the rationale underlying the patentee's amendment bears no more than a tangential relation to the equivalent in question; or (3) the patentee could not otherwise reasonably be expected to have described the insubstantial substitute in question.

Here, there is no estoppel to bar Forcefield from asserting that Brain Pad's insert is an equivalent of the insert of the '174 Patent.  Any amendments to the claims made by the inventor during prosecution simply had nothing to do with the element at issue.  Stated simply, the inventor <u>never</u> disclaimed a polymeric insert that is manufactured either flat or with slight curvature that then obtains curvature from the item in which it is inserted.

In fact, the only subject matter disclaimed by the inventor during prosecution was regarding items such as *reversibility* and the insert being *permanently placed* in the sweatband. Therefore, such "bear no more than a tangential relationship to the equivalent in question," thus placing Forcefield squarely within the Supreme Court's above-listed "exception number 2" to the presumption of prosecution history estoppel.

In sum, because Brain Pad's insert performs substantially the same function as Forcefield's, in substantially the same way, to obtain the same result, Brain Pad's insert meets this '174 claim limitation *at least* under the doctrine of equivalents [See Chisum on Patents S. 18.04].

It should be noted that all polymeric padding strips are manufactured relatively straight in nature, and such strips then curve to conform to the shape of the substrate or item to which they are applied.  It is well accepted that it would be far too costly and far too impractical to manufacture polymeric padding strips with strong "pre-curvature." In the context of this invention, such would prevent the padding from properly and comfortably conforming to the shape and size of any head, rendering the resulting product useless.  In fact, one of the very reasons to use polymers is because such conform so effectively to the shape of the annular sweatband and shape of each head.

As highlighted by Dr. Carl J. Abraham, "when packaged, the headband conforms to the flat packaging" and "when placed on a head of any configuration, the ForceField headband conforms to the total radius of the head regardless of the shape." (**EXHIBIT F** - Abraham Expert Report, Page 8, L. 11-16).  Simply stated then, the compliant nature is an ***inherent*** property of the material(s) in question, as is clearly understood by those skilled in the art.

Consistent with the foregoing, the '174 specification makes it abundantly clear that the inventor's intention was for the insert to have the ability to comfortably conform to each user's head – regardless of the exact shape and size of each head.  For instance, Col. 6, L. 60-62 of the Patent states: "In the preferred mode, insert (16) is relatively thin in nature, and may be in the form of foam padding or a semi-rigid, **pliable** polymer."  Indeed, no two heads have the identical size, shape, and curvature.  This is why typical headbands do not come in a plurality of fitted sizes.   In fact, Plaintiffs placed the patent number on its product packaging, proving that

14

Plaintiffs considered its product to be well within the scope of Claim 1. Plaintiffs' product has always had a compliant insert. Brain Pad's insert of course conforms to the shape of each head in the same manner as taught by the '174 Patent, for the same reasons.

## 5.**" The Insert Of Sufficient Length To Protect An Intended Area And Of Sufficient Width"**

Regarding this claim element, it should first be noted that Brain Pad's insert has dimensions (including length and width) that are sufficient to protect the user from injury. (see **EXHIBIT B** - Appendix E, Figure 17 and Appendix F, Figure 21).

More importantly, the Court's *Markman* Ruling regarding "intended area" is *"at least one insert can be positioned in a variety of places within the sweatband, including covering the entire horizontal circumference of the head."* Claim 1 further describes the insert as "positioned to protect at least the forehead area of a user,"  In other words, the least amount of intended coverage is the forehead only, and the greatest amount of intended coverage is the full horizontal circumference of the head (to be decided based on need).

As previously established, Brain Pad's sweatband contains an insert in the sweatband to protect the user from injury.  Brain Pad's insert clearly protects at least the forehead area. This is proven by **EXHIBIT B** - Appendix E, Figures 11, 12, 14, and Figure 16 Element A; Appendix F, Figure 28.  Because the '174 patent is for reducing the risk of head injuries to children and other players, it is not surprising that the claims and specification provide such coverage.  Brain Pad provides the same circumferential protection for the same reasons.  Brain Pad's insert covers the entire horizontal circumference of the head, placing it squarely within the *Markman* construction. As such, Brain Pad's product literally meets the "intended area" claim limitation.

**6. "The Sweatband Reversible, Functioning To Allow The Interior Portion To Dry While The Exterior Portion Is Placed Against The User"**

Regarding this claim 1 element, Brain Pad's sweatband can indeed be reversed to allow the interior section to become the exterior section, such that the interior section can dry as perspiration evaporates. This is proven by **EXHIBIT B** - Appendix E, Figure 15.  In addition, Plaintiff's expert testified that he turned the Brain Pad product inside-out to verify that it could be reversed (**EXHIBIT B**, P. 38, L.3).  Thus, Brain Pad's product literally meets the "reversibility" claim limitation.

**7. "The Apparatus Functioning To Absorb Perspiration And Absorb And Dissipate Impact Forces, With Only Remaining Forces Distributed To The User"**

Regarding the final language of Claim 1, Brain Pad's product absorbs perspiration.  As noted above, Brain Pad's product also absorbs impact forces and allows such forces to dissipate within the material of the product.  Again, this is proven by **EXHIBIT B** - Appendix E, Figure 11 and Figure 12 and Appendix F, Figure 20, Figure 22 b and Figure 28.  Thus, Brain Pad's product satisfies the final language of Claim 1.

In sum, each and every element of Claim 1 of the '174 Patent is found in the accused product either literally or under the doctrine of equivalents. There are no legitimate, genuine disputes regarding the features of Brain Pad's product, thus the accused product infringes at least Claim 1.

**B. CLAIM 2:**

Claim 2  reads as follows: "The apparatus as described in claim 1, wherein the insert is soft, pliable padding material with **consistent memory**." The Court's *Markman* ruling regarding "consistent memory" is *"consistently returns to its manufactured shape after deformation."*

16

The Brain Pad insert is a soft, compliant material that has memory of its shape in that it retains its manufactured shape for a very long period of time, and returns to its manufactured shape after deformation and dissipation of forces during impact.  This is proven by **EXHIBIT B** - Appendix E, Figure 11 and Figure 12 and Appendix F, Figure 20, Figure 22 b and Figure 28. Plaintiff's expert also testified that he stretched the Brain Pad product and observed that it returned to its manufactured shape after deformation. (**EXHIBIT B**, P. 38, L.13).  Plaintiff's expert also further testified that: "the BrainPad product in use on the head of a user returns to its initial shape after a force is released." (**EXHIBIT E**, P. 17, L.12).

Moreover, inventor Dr. Carl J. Abraham noted that the "insert is designed to be consistently reproducible with reference to absorbing and dissipating the impact forces repetitively.  The only way that could be accomplished is if the polymeric system chosen had consistent memory for the predicted life of the product" (**EXHIBIT F -** Abraham Expert Report, P. 9, L. 11-16).

Brain Pad's product uses a polymeric system that accomplishes the above-noted objectives. Stated simply, if Brain Pad's insert did *not* have consistent memory, the insert would fail to absorb and dissipate forces from a *second* impact, which would render the Brain Pad product useless. Therefore, Brain Pad's insert has "consistent memory," thus it infringes Claim 2.

## C. CLAIM 3:

Claim 3 reads as follows: "The apparatus as described in claim 1, wherein the insert is a **semi-rigid** polymeric material."  The *Markman* ruling regarding "semi-rigid" is *"neither stiff nor pliable."*  Brain Pad's insert is indeed manufactured using a semi-rigid polymeric material. (See **EXHIBIT B** - Appendix E, Figures 17 and 18).  Brain Pad's insert is obviously not "*stiff*," as it is soft and easily bent.  Regarding Brain Pad's insert having some *rigidity*, Plaintiff's expert testified that: "although the resistance to deformation is very small because of its very thin cross

section, it is still noticeable. If I hold the insert in my hand, I feel a slight resistance if I try to deform it." (**EXHIBIT E**, P. 18, L.15).  As such, Brain Pad's insert is semi-rigid because it has measurable resistance to deformation.  (See **EXHIBIT E** - Stolfi Expert Rebuttal Report, Page 19, L. 19 to Page 20, L. 3).  Therefore, the accused product infringes Claim 3.

## D. CLAIM 4:

Claim 4 reads as follows: "The apparatus as described in claim 3, wherein the polymeric material is selected from the group consisting of polyurethane, polymers, and co-polymers, alone or in combination."  Brain Pad's insert is manufactured using a single "polymer," a "co-polymer" or a "combination" of polymers and other plastics.  Specifically, Brain Pad confirms that the insert is manufactured from Calprene® HP-900 NS. (**EXHIBIT B** - Appendix E, Figure 12, "Inner Material: Impact absorbing, perforated [sic], Calprene HP-900 NS."; Appendix G, Figures 29, 30, 31, 32). "Calprene" is the trade name of a number of Butadiene/Styrene thermoplastic copolymers manufactured by Dynasol (www.dynasolelastomers .com).  Therefore, there can be no dispute that Brain Pad's product uses polymers and infringes Claim 4.

## E. CLAIM 5:

Claim 5 reads as follows: "The apparatus as described in claim 1, wherein the insert comprises **apertures** which function to allow air to pass therethrough."  The Court's *Markman* Ruling regarding "apertures" is "*any openings in the insert, regardless of type or orientation*."

Brain Pad's insert clearly comprises apertures. This is proven by **EXHIBIT B** - Appendix E, Figure 12, which states "Inner Material: Impact absorbing, <u>perforated</u> [*sic*], Calprene HP-900 NS." "Comfort Control: 60 air-flow vent holes!" and Appendix E, Figure 17, Element A, Appendix F, Figure 25, which states "Includes 60 built in <u>air flow vents</u>." (emphasis added).

18

In addition, per **EXHIBIT D**, the Manzo patent application (which describes Brain Pad's product) states that it is "…provided with a plurality of **perforations** 16…" (which are also shown in Fig. 3 of the Manzo application), representing the same structure taught by Abraham. Though particular size, shape, and orientation are not required by the claim language, Brain Pad's apertures' size, shape, and orientation are actually the same as the examples taught by the '174 Patent.  As such, Brain Pad's product certainly meets the broader language of Claim 5.

## F. CLAIM 6:

Claim 6 reads as follows: "The apparatus as described in claim 1, wherein ends of the sweatband are permanently affixed to one another and the sweatband is slid over an area intended to be protected."

Brain Pad's sweatband is formed in an annulus by permanently attaching one end to the other. This is proven by **EXHIBIT B** - Appendix E, Figure 13, Figure 14, Figure 15, Figure 17 c, Figure 18 b; Appendix F, Figure 28.  Brain Pad's sweatband can of course be slipped over the area to be protected during an athletic activity. This is proven by **EXHIBIT B** - Appendix E, Figure 13 and Figure 14; Appendix F, Figure 28.  In addition, Plaintiff's expert testified that he placed Brain Pad's product on his head to verify that it fit in the above-described manner. (**EXHIBIT B**, P. 37, L.1).  Thus, the accused product easily meets all limitations of Claim 6.

## G. CLAIM 7:

Claim 7 reads as follows: "The apparatus as described in claim 1, wherein the apparatus is utilized in activities selected from the group consisting of soccer, basketball, football, hockey, baseball, softball, lacrosse, skiing, horseback riding, climbing, skateboarding, roller skating, cycling, motorcycling, automobile racing, and snowmobiling." Brain Pad's sweatband can be

configured to provide injury protection for different athletic activities. This is proven by **EXHIBIT B** - Appendix E, Figure 10 b, Element A; Appendix F, Figure 20 b, which states: "It's not just for Team Sports!," "For all competitors across a multitude of sports and neighborhood activities!," Figure 25 and Figure 26, which states: "Suitable for all contact sports for added comfort and protection"). Thus, Brain Pad's product meets the limitations of Claim 7 as well.

## H. CLAIM 9:

Claim 9 reads as follows: "The apparatus as described in claim 1, wherein the sweatband may be washed with the insert permanently in place."

Brain Pad's product may indeed be washed with the insert permanently in place. This is proven by **EXHIBIT B** - Appendix F, Figure 27 which states: "One size fits all; washable".(emphasis added). Thus, Brain Pad's product meets the limitations of Claim 9.

## V.  CONCLUSION:

Brain Pad's product contains every limitation of the asserted claims of the '174 patent and thus infringes the claims literally. Even if there were no literal infringement, Brain Pad's product infringes under the doctrine of equivalents.  In *Paice, LLC. v. Toyota Motor Corp.*, 85 USPQ2d 1001 (Fed. Cir. 2007), the Federal Circuit upheld a District Court judgment of infringement, finding that the plaintiff's expert testimony was sufficient to show how the function, way, result test was met, gave a substantial amount of testimony that concerned the technology at issue, and was not required to discuss any differences between the literal claims and the devices and why these differences were insubstantial.  Such is precisely the situation here, as the attached Expert Report of Dr. Fred R. Stolfi, as well as the other testimony and exhibits, delineate how each element of the '174 claims are found in the Brain Pad product.

Dated:  Calverton, New York
      February 3, 2010

Respectfully submitted,

/s/ Todd Wengrovsky
Todd Wengrovsky, Esq.
Law Offices of
Todd Wengrovsky, PLLC.
285 Southfield Road, Box 585
Calverton, NY 11933
*Attorney for Plaintiff Pro Hac Vice*

Jeffrey K. Martin, Esq.
1508 Pennsylvania Avenue
Wilmington, DE  19806
*Attorney for Plaintiff*